UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

- v. -

NIKHIL GUPTA

*Defendant.*

No. 23 Cr. 289 (VM)

---

# DECLARATION OF DEFENDANT NIKHIL GUPTA

Pursuant to 28 U.S.C. § 1746, I state the following:

1. I respectfully submit this declaration in support of the defense's motions to suppress certain evidence and to exclude statements that the government contends were made by me to law enforcement officers. This declaration was prepared with the assistance of counsel. The information contained herein is based on my recollection of the events in question. To the extent this declaration recounts a conversation, it is described in substance and in part.

2. On June 30, 2023, I boarded a flight from Istanbul to Prague. After my flight landed in Prague, I went through the airport formalities and then prepared to leave the airport. As I was about to exit the airport, I was surrounded by six or seven individuals in civilian clothes who did not immediately identify themselves. Then one of the individuals physically grabbed me. They spoke broken English with an accent and said, in sum and substance, that I was under arrest, that they needed to search me, and that I had to go back into the airport.

3. I was not made aware of any rights at the time of my arrest including any right to remain silent or to an attorney.

4. The people who arrested me, whom I came to understand were Czech law enforcement officers, brought me to a private room off to the side of the airport exit. The room

had no windows and had only one door, which the six or seven Czech officers closed behind them after we all entered.

5. There was a table in the room and the Czech officers told me to put my luggage on the table. After I did so, they began to search it.

6. Next, the Czech officers told me to take off all my clothing so they could search me. One of the officers was female and I asked if she would leave the room before I removed my clothing. After she left, I took off my clothing. Once I was fully naked, the officers searched me. When the officers had finished their search, they allowed me to put my clothing back on.

7. The officers spoke to each other in a foreign language that I believed to be Czech throughout this process. They only spoke English when they were addressing me.

8. The officers had taken three phones from me and my luggage and put them on the table. They told me they wanted to look at the phones. I did not feel like I had any choice in the matter. I was not given the option to speak with an attorney or to refuse the request.

9. The officers ordered me to unlock the phones and asked me for the passwords to the phones. One of the phones did not have a password. For the other two, I relayed the passwords orally and entered the passwords into the phones.

10. The officers wrote down the passwords that I provided and, after I had unlocked the phones and given the passwords, they told me to put the phones into airplane mode. The officers then took the phones and put them into a bag.

11. Immediately after I provided the Czech law enforcement officials with my phones and passwords, one of the male officers took out his phone, called someone, and left the room. As he left the room, I heard him speaking to the person on the other end in English.

12. The officer who had made the phone call returned to the room several minutes later, and when he returned, he said, in sum and substance, that he and his colleagues did not know why

2

but that I was under arrest because America wanted me. The officers then handcuffed me, and we left the room.

13. I believe I was in the room where I was strip searched for roughly 30 minutes.

14. The Czech officers escorted me, in handcuffs, down a different corridor and through many doors to a back exit out of the airport.

15. After we exited the airport, we approached a dark colored SUV with tinted windows that had three rows. A man, whom I later learned was Special Agent Mark Franks, opened the door to the SUV and stepped out of the SUV. Another man, whom I later learned was Task Force Officer Jose Sandobal, was sitting in the back row of the SUV.

16. I was placed in the back row of the car, with my hands still cuffed, in between Special Agent Franks and Task Force Officer Sandobal. Five of the Czech officers also got into the car.

17. One of the Czech officers told Special Agent Franks and Task Force Officer Sandobal, in sum and substance, that they were taking the long route to give the Americans time to talk to me. Task Force Officer Sandobal thanked the Czech officer and said he understood.

18. My hands were cuffed for the entire car ride. It was dark in the car, and I did not have my glasses. I cannot read without my glasses, especially when the light is bad.

19. Before the car started moving, Task Force Officer Sandobal called me brother and said to me, in sum and substance, that I was welcome and that he and Special Agent Franks were Americans. He then asked how I was. Neither Task Force Officer Sandobal nor Special Agent Franks told me their names and they did not identify themselves as law enforcement. I only learned who they were at a later date.

3

20. After the car was moving, Task Force Officer Sandobal asked the Czech officers for the phones. The female Czech officer, who had been holding the bag with the phones, took the phones out of the bag and gave them to Special Agent Franks.

21. The car drove around for a while and during that time, Special Agent Franks and Task Force Officer Sandobal asked me a lot of questions. I remember that they asked me why I was in the Czech Republic and whether I came alone or with somebody else. Neither Special Agent Franks nor Task Force Officer Sandobal informed me that I had any rights, including the right to remain silent or to an attorney, before they began asking me questions.

22. Neither Special Agent Franks nor Task Force Officer Sandobal brought up the allegations in this case to me during the car ride. At no point during the car ride did I mention anything about having someone in New York City killed.

23. During the ride, I watched Task Force Officer Sandobal and Special Agent Franks examine and look through the phones that the Czech officer had handed to Special Agent Franks, and I watched Special Agent Franks take pictures of something on the phones with his own phone.

24. At the end of the car ride, after driving around for a while, we arrived at a building. Task Force Officer Sandobal handed me a piece of paper and told me to print my name. It was dark in the car, and I did not have my glasses, so I could not read what the paper said. Because English is not my first language, I am not always comfortable speaking or understanding English, and I need to be able to focus and spend a lot of time reading in order to understand documents written in English. That is why I have a Hindi interpreter when I appear in court. At no point during the car ride was I offered a Hindi interpreter. Additionally, Task Force Officer Sandobal did not give me the time necessary to read the document, and so I printed my name without knowing what the document said.

25. After I had printed my name, Task Force Officer Sandobal asked me to sign the form. I asked what the form was, and Task Force Officer Sandobal told me, in sum and substance, that the form said that I didn't need an attorney for the Americans to question me. I refused to sign my name and did not write anything further on the paper. At no point did either Task Force Officer Sandobal or Special Agent Franks read the document to me, tell me what it was, or give me sufficient time and light to read it.

26. I was then taken out of the car and held in Czech custody.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 23, 2025.

_____
Nikhil Gupta