UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NIKHIL GUPTA,
a/k/a "Nick,"

*Defendant*.

S2 23 Cr. 289 (VM)

**THE GOVERNMENT'S POST-SUPPRESSION HEARING SUBMISSION IN OPPOSITION TO NIKHIL GUPTA'S PRETRIAL MOTIONS**

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10007

Alexander N. Li
Ashley C. Nicolas
Camille L. Fletcher
Assistant United States Attorneys
*Of Counsel*

The Government respectfully submits this memorandum to address the three issues that were the subject of the August 12, 2025 evidentiary hearing (the "Hearing"). (*See* Dkt. 77, 86). As set forth below, the evidence at the Hearing and in the record establishes, by greater than a preponderance of the evidence, that: (i) there was no joint venture between U.S. and Czech law enforcement to obtain Gupta's cellphone passcode; (ii) Gupta voluntarily provided his passcode to the Czech police; and (iii) Gupta was advised of his *Miranda* rights, and knowingly and voluntarily waived those rights, before being questioned by the Drug Enforcement Administration ("DEA"). The Court should therefore deny Gupta's pretrial motions. (*See* Dkt. 66).

**THE HEARING**

At the Hearing, the Government called one witness, DEA Task Force Officer ("TFO") Jose Sandobal, and introduced ten exhibits. TFO Sandobal, one of the two DEA case agents responsible for the investigation into Gupta, described his meetings with the Czech police to coordinate Gupta's arrest, the updates he received from the Czech police during and immediately after Gupta's arrest (at which the DEA was not physically present), and his interview of Gupta in the van as the Czech police drove Gupta to the Prague jail. (Tr. 9-75).[1] As discussed in greater detail below, TFO Sandobal testified that after Gupta's arrest, the Czech police reported that Gupta had voluntarily provided his cellphone passcodes and that he had consented to the search of at least one phone, (Tr. 10-11); that to his knowledge, no one from the DEA had requested that the Czech police ask Gupta for his passcode, (Tr. 11); that TFO Sandobal and the other DEA case agent, Special Agent ("SA") Mark Franks (collectively, the "Case Agents"), advised Gupta of his rights

[1] "Tr" refers to the transcript of the Hearing; "GX" refers to a Government exhibit entered into evidence at the Hearing; and "DX" refers to a defense exhibit entered into evidence at the Hearing.

before asking him any questions about the case, (Tr. 12); and that Gupta waived those rights, (Tr. 12). TFO Sandobal's testimony was corroborated by other evidence at the Hearing.

Although the defense had indicated that it might call SA Franks, who was available to testify, Gupta declined to call any witnesses and did not himself testify. (Tr. 139-40). Gupta instead offered four exhibits: text messages between the Case Agents about printing the advice-of-rights form on the day of Gupta's arrest, (DX 113; *see* Tr. 97-99); and three exhibits documenting the Government's use of Gupta's passcode in obtaining access to the contents of his phone, (DX 103-105). Before the hearing, Gupta filed a declaration claiming, among other things, that he was not advised of his rights before being questioned by the DEA agents. (Dkt. 67 ¶¶ 21, 24). Because Gupta did not testify, the Court should not credit his declaration. *See United States v. Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999) ("[T]he self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing."); *United States v. Cherry*, 541 F. Supp. 3d 407, 422 (S.D.N.Y. 2021) ("Courts give greater weight to witness testimony, which was subject to cross examination . . . even where an adversary has submitted an affidavit or declaration.").[2]

## THERE WAS NO JOINT VENTURE TO OBTAIN GUPTA'S PASSCODE

Although *Miranda* warnings are required before custodial interrogations in the United States, "the law is settled that statements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary." *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003). One exception is the "joint venture" doctrine, under which "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever

[2] Unless otherwise specified, all case quotation omit internal quotation marks, citations, and prior alterations.

United States law enforcement agents actively participate in questioning conducted by foreign authorities." *Id*. "If the government can show that the United States and foreign law enforcement went no further than providing assistance and sharing information, a joint venture has been disproven. This is particularly true where U.S. authorities do not themselves conduct the interview in question." *Id.* at 367; *see also United States v. Zhukov*, 537 F. Supp. 3d 431, 436 (E.D.N.Y. 2021) ("[T]he joint-venture analysis focuses less on the overall level of cooperation between the two nations, and more on the U.S. agents' efforts to direct the *specific* questioning at issue.").

The evidence at the Hearing established that there was no joint venture between U.S. and Czech law enforcement to obtain Gupta's passcode.

TFO Sandobal testified that in advance of Gupta's arrest, the Case Agents attended two meetings and one dinner with the Czech police. (Tr. 13-14). The first meeting was on June 29, 2023, the day before the arrest. The Case Agents and Special Agents Kyle Brannon and Joe Catalano, who were the DEA country attaché and assistant country attaché, respectively (the "Attachés"), met at Czech police headquarters with three or four Czech officers, including Kazar Petr, a supervisor. (Tr. 14, 16). At that meeting, which was less than an hour, the attendees discussed the logistics of the arrest, including Gupta's arrival time. (Tr. 17). The Czech police informed the Case Agents that they would not be permitted to participate in Gupta's arrest and instead would have to remain outside the Prague airport while the arrest took place inside. (Tr. 17). The Czech police told the Case Agents that after Gupta's arrest, however, the Case Agents could interview Gupta during the ride from the airport to the jail. (Tr. 17). During this meeting, the DEA agents communicated that they would like Gupta's belongings, including any cellphones, to be seized by the Czech police. (Tr. 18). In addition, TFO Sandobal recalled discussing that "[w]e hoped that [Gupta] would be cooperative to allow us to take a look at his phones," and that

someone from the DEA — TFO Sandobal did not recall who — remarked that "if [the phones] were unlocked, even better." (Tr. 18). Later that day, the Case Agents and the Attachés attended a dinner with the Czech police, at which nothing substantive was discussed. (Tr. 19-21).

The second meeting occurred on June 30, 2023, the day of the arrest. (Tr. 21). Before leaving for the meeting, the Case Agents exchanged text messages about printing the advice-of-rights form at their hotel. (DX 113; Tr. 96-99). At the meeting, which lasted less than 30 minutes, the Case Agents, the Attachés, and members of the Czech police confirmed that Gupta was on the flight manifest and expected to arrive in Prague. (Tr. 21-22). TFO Sandobal recalled no discussion about Gupta's cellphones or passcodes at the second meeting. (Tr. 23).

TFO Sandobal testified that immediately after the second meeting, the Case Agents (but not the Attachés) traveled with the Czech arrest team to the Prague airport. (Tr. 9, 23, 46). TFO Sandobal recalled no discussion during the ride with the Czech police officers — who were speaking among themselves in Czech — about Gupta's cellphones or passcodes. (Tr. 24). When they arrived at the Prague airport, the Czech police entered the airport to arrest Gupta while the Case Agents remained in the van. (Tr. 10, 46). While the Case Agents were waiting, Kazar Petr circulated updates on the arrest in a WhatsApp group chat that included the Case Agents, the Attachés, and members of the Czech police (the "Group Chat"). (Tr. 25-30; GX 111). At approximately 7:32 p.m. (Prague time), Kazar Petr circulated a video of Gupta unlocking his passcode for the Czech Police (the "Passcode Video"). (GX 112; *see also* Tr. 38-41). Soon thereafter, the Czech arrest team left the airport and returned to the van with Gupta. (Tr. 43).

TFO Sandobal's detailed testimony, which is corroborated by contemporaneous text messages and is uncontradicted by any other witness, is credible and conclusively establishes that no joint venture existed. The Case Agents were not in the airport when the Czech police asked

Gupta for his passcodes. On the day of the arrest, the DEA made no requests at all via the Group Chat, and instead passively received updates from the Czech police. (GX 111; Tr. 29). And TFO Sandobal testified unequivocally that to his knowledge, no one "from the DEA requested that the Czech Police ask the defendant for his passcodes." (Tr. 11). Because "U.S. authorities [did] not themselves conduct the interview in question," *Bary*, 978 F. Supp. 2d at 367, and there was no effort by U.S. authorities to "direct the *specific* questioning at issue," *Zhukov*, 537 F. Supp. 3d at 436, there was no joint venture to obtain Gupta's passcodes.

In fact, the evidence at the Hearing revealed only a single pre-arrest discussion of Gupta's cellphones between the DEA and the Czech police. TFO Sandobal recalled that at the June 29, 2023 meeting at Czech police headquarters, the DEA asked the Czech police to seize Gupta's belongings, including his cellphones, and the DEA expressed "hope[] that he would be cooperative to allow us to take a look at his phones," and "if they were unlocked, even better." (Tr. 18). The DEA's request that the Czech authorities seize Gupta's cellphones does not impact the joint venture inquiry. The seizure of evidence incident to arrest is routine police practice. In fact, it was contemplated as a step in the normal course included by the United States in its request for Czech assistance via its provisional arrest request. (Dkt. 75, at 8). "Evidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its borders is insufficient as a matter of law to constitute United States participation under the joint venture doctrine." *Yousef*, 327 F.3d at 146. As for the DEA's musing that it would be helpful if Gupta was cooperative and unlocked his phone, that is an obvious investigative fact and a far cry from even a suggestion — much less a directive — to the Czech police. Indeed, courts have held there is no joint venture even when foreign authorities *accept* suggestions for questioning from

U.S. law enforcement. *See United States v. Abu Ali*, 528 F.3d 210, 228-29 (4th Cir. 2008). The facts at issue here are far removed from any such situation.

The Court should therefore find there was no joint venture to obtain Gupta's passcode.

**GUPTA VOLUNTARILY PROVIDED HIS PASSCODE TO THE CZECH POLICE**

In any event, Gupta voluntarily provided his passcodes to the Czech authorities. "Whenever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary." *United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972). The "due process voluntariness test" asks "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). "The due process test takes into consideration the totality of all the surrounding circumstances," *id.*, including "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials," *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018). "[C]oercive police activity," however, "is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

Perhaps the best evidence of the circumstances surrounding Gupta's provision of his passcode is the Passcode Video. (GX 112). That video shows Gupta entering his passcode in a well-lit room at the Prague airport, without handcuffs, in the presence of Czech officers wearing t-shirts, shorts, and sneakers. (Tr. 40-41). In the video, a Czech officer speaks calmly in English to Gupta, and Gupta responds calmly in English. (Tr. 39-40). No one in the video is carrying a weapon, and no one raises his or her voice. (Tr. 40-41). Indeed, Gupta himself makes no allegations relating to threats, intimidation, weapons, violence, restraints, or extended questioning. (Dkt. 67 ¶¶ 3-14). On the contrary, Gupta acknowledges that the Czech officers were wearing

civilian clothing, (*id.* ¶ 2); that at his request, a female officer left the room before he was searched without clothing (*id*. ¶ 6), that his processing in the room took only 30 minutes, (*id.* ¶ 13), and that he was not handcuffed until he departed the room for the van, (*id.* ¶ 12).

TFO Sandobal's testimony and the contemporaneous evidence corroborate what the Passcode Video demonstrates. TFO Sandobal testified that when the Czech arrest team arrived at the airport, they told him that Gupta had voluntarily provided his cellphone passcodes and consented to a search of at least one phone. (Tr. 74; *see also* Tr. 10-11, 133-34). Later that evening, the Case Agents texted the prosecutors that three phones had been seized and that Gupta "gave the codes to unlock them to the arrest team." (GX 107; *see also* Tr. 121). And in a July 12, 2023 report documenting Gupta's arrest, SA Franks memorialized that the Czech police had advised "that Gupta voluntarily provided them with the phone passwords." (GX 108; *see also* Tr. 135). TFO Sandobal also testified that Gupta appeared "very relaxed" and "cooperative" when he arrived at the van, and that at no point during the van ride did Gupta say he had been threatened, harmed, or forced to provide his passcode to the Czech police. (Tr. 45, 47, 66). TFO Sandobal confirmed that the Czech arrest team was wearing civilian clothing and did not appear to be armed. (Tr. 46). Nor were the DEA agents armed. (Tr. 46).

The totality of the circumstances thus makes clear that Gupta voluntarily provided his passcode to the Czech police. There simply are no indicia of the "coercive police activity" that is a "necessary predicate" to find his statement was "not 'voluntary' within the meaning of the Due Process Clause." *Connelly*, 479 U.S. at 167. At most, Gupta's declaration — which the Court should afford no weight, *see supra* at 2 — indicates he "did not feel like [he] had any choice" when the Czech officers asked to "look at the phones." (*Id.* ¶¶ 7, 8, 24). But "[t]he Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from

sources other than official coercion." *Berghuis*, 560 U.S. 370, 387 (2010). There is also good reason to doubt Gupta's self-serving declaration: As set forth below, Gupta's willingness to speak and give evidence to the Case Agents in the van, along with his sophistication, strongly indicate that his "will" was not "overborne by the circumstances surrounding the giving of" his passcode. *Dickerson*, 530 U.S. at 434. On the contrary, Gupta was clearly willing at that time to assist the police. The Court should therefore find that Gupta voluntarily provided his passcode to the Czech police.

## **GUPTA KNOWINGLY AND VOLUNTARILY WAIVED HIS *MIRANDA* RIGHTS**

The evidence at the Hearing also established that the Case Agents advised Gupta of his rights, and Gupta knowingly and voluntarily waived those rights, before substantive questioning by the DEA during the van ride.

TFO Sandobal testified that before asking Gupta any questions about the case, the Case Agents introduced themselves and showed Gupta their DEA credentials. (Tr. 49-51; GX 103, 104). Gupta responded by asking the Case Agents to take him to America and offering to provide any information they wanted. Despite Gupta's insistence on discussing the case, the Case Agents told Gupta that they had to read him his rights first. (Tr. 52). SA Franks then read from a printed advice-of-rights form, which advised Gupta, among other things, that he had "the right to remain silent," that anything he said "can be used against [him] in court," that he had "the right to talk to a la[w]yer", and that if he decided "to answer questions now without a lawyer present," he had "the right to stop answering at any time." (Tr. 57; GX 101). Gupta was given his glasses and a copy of the form to read along. (Tr. 54-55). After SA Franks read Gupta his rights, TFO Sandobal asked Gupta whether he needed further explanation about his rights and noted that Gupta could skip any questions he didn't want to answer. (Tr. 58). Gupta confirmed that he understood his rights, stating "I understand." (Tr. 58). Gupta also confirmed that he was willing to talk to the

Case Agents, by nodding and saying "yes, what do you want to know." (Tr. 59). The Case Agents proceeded on Gupta's oral waiver, without asking him to sign the advice-of-rights form at that time, because they were in a moving vehicle. (Tr. 59).

TFO Sandobal testified that during his interview, Gupta said that someone named "Amanat" had hired Gupta to carry out a murder for hire in New York City. (Tr. 12-13, 60-61). The Case Agents asked for Amanat's phone number, and Gupta agreed to provide the number, which was on Gupta's phone. (Tr. 61-62). Gupta identified which of his three phones had Amanat's number, and a Czech officer passed the phone to SA Franks, who handed it to Gupta. (Tr. 62). Gupta opened his phone, and SA Franks searched for Amanat's contact information and took a photograph of it. (GX 105; Tr. 63-64).[3] The interview lasted 10 to 15 minutes. (Tr. 67).

TFO Sandobal testified that Gupta's entire conversation with the Case Agents was in English. (Tr. 53). TFO Sandobal testified that Gupta's English was "[v]ery fluent," and he appeared to understand the Case Agents. (Tr. 53). As further evidence of Gupta's English fluency, the Government introduced a photograph of English-language books and magazines, including *The Alchemist* and *The Economist*, that Gupta possessed at the time of his extradition. (GX 106).

TFO Sandobal testified that when the van arrived at the Prague jail, the Case Agents asked Gupta to sign the advice-of-rights form. (Tr. 67). Gupta put on his glasses and printed his name on the form, but refused to sign because he wanted to place a phone call first. (Tr. 67-68). SA Franks wrote "REFUSED" on the form to document Gupta's refusal to sign. (Tr. 69). TFO

---

[3] Gupta's counsel suggested, in cross-examination, that there was insufficient light in the van to read a form because the background of GX 105 appeared dark. (Tr. 111-15). TFO explained that although the van's windows were tinted, there was "[p]lenty of light" in the van to read a form, and that the background of GX 105 appeared dark only because the photograph's exposure was locked onto the brightly-lit cellphone containing the Amanat contact information. (Tr. 122-23). TFO testified that Gupta had no difficulty writing his name on the form, and that SA Franks had no difficulty writing on the form either. (Tr. 124).

Sandobal's testimony regarding Gupta's post-arrest interview, including his receipt and waiver of *Miranda* warnings, is consistent with the July 12, 2023 DEA report of Gupta's arrest entered as evidence at the Hearing. (GX 108). TFO Sandobal's testimony is also corroborated by the advice-of-rights form itself. (GX 101).

The evidence at the Hearing thus establishes every requirement of *Miranda*: (i) before being questioned, Gupta was advised of his rights in a language with which he has demonstrated fluency; (ii) Gupta verbally and unambiguously confirmed his understanding of his rights; and (iii) Gupta voluntarily waived his rights in an environment featuring no police coercion whatsoever. It is immaterial that Gupta did not sign the form. "[A] waiver need not be confirmed in writing." *United States v. Booth*, 583 F. Supp. 3d 545, 552-53 (S.D.N.Y. 2022). The inquiry is simply whether the defendant was given *Miranda* warnings and then knowingly and voluntarily waived his rights. *See, e.g.*, *Berghuis*, 560 U.S. at 385-88 (waiver valid despite unsigned written waiver). The Court should therefore find that Gupta was advised of his rights and knowingly and voluntarily waived those rights before substantive questioning by the DEA.

**CONCLUSION**

For the reasons set forth above and in the Government's prior submissions, (Dkt. 75, 92), Gupta's pretrial motions should be denied.

Dated: New York, New York
August 26, 2025

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: ______________________________
Alexander Li / Ashley C. Nicolas / Camille L. Fletcher
Assistant United States Attorneys
(212) 637-2265 /-2467 /-2383