**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

- v. -

NIKHIL GUPTA,

Defendant.

No. 23 Cr. 289 (VM)

**DEFENDANT NIKHIL GUPTA'S POST-HEARING MEMORANDUM IN SUPPORT OF HIS MOTION TO SUPPRESS CERTAIN EVIDENCE AND STATEMENTS**

Nola B. Heller
Matthew Laroche
Peter Farag
Isabel C. Pitaro
Elyse J. Hain
MILBANK LLP
55 Hudson Yards,
New York, NY 10001
(212) 530-5108

*Counsel for Defendant Nikhil Gupta*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

I. THE EVIDENCE ELICITED AT THE HEARING SHOWED THAT THE DEA AND CZECH AUTHORITIES WERE ENGAGED IN A JOINT VENTURE .......................... 2

II. THE GOVERNMENT FAILED TO REBUT MR. GUPTA'S CLAIM THAT HIS STATEMENTS DURING THE CZECH INTERROGATION WERE INVOLUNTARY ........................................................................................ 6

III. THE DEA FAILED TO PROPERLY ADVISE MR. GUPTA OF HIS RIGHTS.............. 7

IV. MR. GUPTA DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS RIGHTS ........................................................................................ 9

CONCLUSION....................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985) ........ 8

*Colorado v. Connelly*,
479 U.S. 157 (1986) ........ 6

*Miranda v. Arizona*,
384 U.S. 436 (1966) ........ *passim*

*United States v. Abu Ali*,
528 F.3d 210 (4th Cir. 2008) ........ 2

*United States v. Bary*,
978 F. Supp. 2d 356 (S.D.N.Y. 2013) ........ 4

*United States v. Brown*,
125 F.4th 1186 (D.C. Cir. 2025) ........ 7

*United States v. Medunjanin*,
752 F.3d 576 (2d Cir. 2014) ........ 7, 9

*United States v. Miller*,
382 F. Supp.2d 350 (N.D.N.Y. 2005) ........ 7

*United States v. Muhammad*,
No. 12 CR 337, 2012 WL 6021458 (E.D.N.Y. Nov. 19, 2012) ........ 7

*United States v. Sultanov*,
742 F. Supp. 3d 258 (E.D.N.Y. 2024) ........ 10

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) ........ 2

*United States v. Zhukov*,
537 F. Supp. 3d 431 (E.D.N.Y. 2021) ........ 2, 5

**Other Authorities**

U.S. Const. amend. V ........ *passim*

## PRELIMINARY STATEMENT

The August 12, 2025 suppression hearing in this matter established that the contents of Mr. Gupta's password-protected cellphones and the statements he made to law enforcement must be suppressed.

The hearing testimony of Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Jose Sandobal—the lone witness called by the government at the hearing—made clear that he and the other DEA agents in this case engaged in a joint venture with Czech law enforcement authorities to arrest and question Mr. Gupta, as well as to seize and unlock his cellphones. The DEA agents met and conferred with the Czech authorities on multiple occasions prior to Mr. Gupta's arrest, and they informed the Czech authorities that they would like Mr. Gupta's phones to be seized and unlocked—an effective direction to the Czech authorities to do so.

Mr. Gupta's claim that his provision of his cellphone passwords to Czech authorities after his arrest was involuntary must also be sustained because the government offered no testimony to rebut it. TFO Sandobal was not present when Mr. Gupta provided his passcodes to the Czech authorities and was unable to provide any first-hand perspective on that encounter. The brief 20-second video the government offered on this subject lacks context and cannot counter Mr. Gupta's sworn allegations.

Finally, Mr. Gupta's alleged statements to the DEA agents after his arrest must be suppressed. The evidence elicited at the hearing did not clearly establish that he was read his rights before he spoke to the agents. To the contrary, Mr. Gupta was given a form to review that he could not possibly have seen inside a darkened van, and he declined to sign the form.

## I. THE EVIDENCE ELICITED AT THE HEARING SHOWED THAT THE DEA AND CZECH AUTHORITIES WERE ENGAGED IN A JOINT VENTURE

The evidence at the hearing showed that the DEA and Czech authorities were engaged in a joint venture to arrest and question Mr. Gupta, necessitating the suppression of his non-*Mirandized* statements. *See United States v. Abu Ali*, 528 F.3d 210, 227 (4th Cir. 2008) ("United States law enforcement officials may not intentionally evade the requirements of *Miranda* by purposefully delegating interrogation duties to foreign law enforcement officers."). As the government has acknowledged, the key question under the joint venture doctrine is whether the government made "efforts to direct the specific questioning at issue" by foreign law enforcement. Dkt. 75 at 17 (quoting *United States v. Zhukov*, 537 F. Supp. 3d 431, 436 (E.D.N.Y. 2021)); *see also United States v. Yousef*, 327 F.3d 56, 145-46 (2d Cir. 2003). TFO Sandobal's testimony clearly demonstrated that the DEA directed Czech law enforcement officers to question Mr. Gupta and obtain his cellphone passwords.

The Court need look no further than the June 29, 2023 meeting between the DEA and Czech law enforcement authorities at the National Drug Headquarters in Prague to conclude that a joint venture took place here. Tr. at 18:1-6.[1] During this hour-long planning meeting, the DEA case agents and Czech law enforcement authorities coordinated the logistics of Mr. Gupta's arrest, which was to occur the following day. Tr. at 17:1-25; 88:14-16. Four DEA agents were present—TFO Sandobal, Special Agent ("SA") Mark Franks, Czech Republic Country Attaché ("CA") Kyle Brannon, and Assistant Country Attaché ("ACA") Joseph Catalano—along with approximately three or four Czech officers, including multiple supervisors. Tr. at 14:16-20; 16:15-21; 87:8-88:1. Although Mr. Gupta was the subject of the DEA's investigation, the DEA lacks arrest power in

[1] "Tr." refers to the transcript of the hearing, and "GX" refers to Government Exhibits admitted at the hearing.

the Czech Republic, thus it was necessary for TFO Sandobal and SA Franks to coordinate with and direct the Czech authorities in order to effect Mr. Gupta's arrest and obtain his cellphones and their passwords. Tr. at 80:18-20; 100:23-25.

TFO Sandobal's testimony made clear that the DEA directed the Czech officers' activities as part of a joint venture. Czech officers and the DEA agents discussed the arrest operation, and the DEA agents then raised the issue of Mr. Gupta's phones. Tr. at 17:1-4; 18:15-20; 90:11-22. After they did so, one of the DEA agents other than TFO Sandobal stated, if Mr. Gupta "has any property on him, cell phones, we would like for it to be seized and if they're unlocked [with his consent], even better." Tr. at 18:1-20; 91:13-25; 92:11-20. These were clear instructions from the DEA to the Czech authorities to obtain Mr. Gupta's cellphones and their passcodes. And of course, that is exactly what occurred the following day after the Czech authorities arrested Mr. Gupta. The Czech officers recorded themselves doing so and immediately shared that recording with the DEA, further indicating that they were acting at the DEA's direction. *See* GX 111, 112.

TFO Sandobal testified that he did not understand the DEA to be instructing the Czech officers to seize Mr. Gupta's phones and obtain his passcodes, but his subjective interpretation of the language that was used is irrelevant to the Court's analysis. The government did not call any Czech officers as witnesses and TFO Sandobal did not discuss with any of them their interpretation of the discussion regarding Mr. Gupta's cellphones (Tr. at 93:21-95:6)—so there is no evidence as to whether or not the Czech officers subjectively perceived the DEA agents to be directing them to obtain the phones and their passcodes.

But no such evidence is needed when the circumstances are clear on their face, as here. The DEA agents planned Mr. Gupta's arrest jointly with the Czech officers and explicitly raised the fact that they wanted his phones and their passcodes. Tr. at 16:24-17:4; 90:11-22. The Czech

officers had no independent reason to seize Mr. Gupta's phones or their passcodes. Tr. at 81:14-23. Any semantic argument that the DEA somehow did not use the "magic words" to direct the Czech authorities fails. The Czech authorities were only seizing the phones and obtaining the passcodes because the DEA agents told them they wanted those items for their investigation. Tr. at 82:6-8. Therefore, they were acting at the DEA's direction.

While the Czech officers had no independent reason for wanting to seize Mr. Gupta's phones and obtain their passcodes, the DEA wanted them for obvious reasons. Without Mr. Gupta's passcodes, the DEA might not have been able to access the content on Mr. Gupta's phones, which may have impaired its investigation. Tr. at 93:1-23. In fact, some of the confidential source's chat recordings with Mr. Gupta had been inadvertently automatically deleted, making it all the more critical to obtain those recordings from Mr. Gupta's phones. Tr. at 137:2-21. It was thus perfectly understandable for the DEA to have raised the issue of Mr. Gupta's phones with the Czech authorities and for the Czech officers to have obtained the phones and their passwords on the DEA's behalf.

Any ambiguity on this issue should be construed in the defense's favor, as the government has not clearly established the absence of a joint venture. *See United States v. Bary,* 978 F. Supp. 2d 356, 367-68 (S.D.N.Y. 2013) ("[T]he Court assumes without deciding that the government must establish the absence of a joint venture."). The government chose not to call ACA Catalano or CA Brannon who, by TFO Sandobal's admission, were responsible for coordinating with the Czechs and might have had more information or clearer memories on what exactly the DEA instructed the Czech authorities to do. Tr. at 15:9-25. TFO Sandobal could not even remember who had raised the issue of the cellphones at the June 29, 2023 meeting. Tr. at 18:17-18; 91:13-21.

The government chose not to produce discovery materials for ACA Catalano or CA Brannon, which could have shed further light on these issues. The government also failed to call any Czech law enforcement officers, who might have testified about their perceptions of whether they were, in fact, engaged in a joint venture with the DEA agents or whether they acted of their own volition in seizing Mr. Gupta's cellphones and the passcodes thereto.[2] The government is thus left only with TFO Sandobal's testimony, which establishes that the DEA told the Czech authorities that it wanted Mr. Gupta's phones and their passwords, effectively directing them to seize those items as part of a joint venture.

*Zhukov*, the case upon which the government principally relies on to support its position on this issue, is inapposite. 537 F. Supp. 3d at 436. In that case, Bulgarian law enforcement officers independently questioned the defendant without any coaching from U.S. law enforcement authorities, and the defendant sought to suppress a statement elicited by a question that was never suggested by U.S. law enforcement to the Bulgarians. *Id.* at 434-35. Here, by contrast, the defense seeks to suppress material that the DEA specifically directed Czech officers to obtain.

Because the evidence at the hearing clearly demonstrated that Czech and U.S. law enforcement authorities were engaged in a joint venture to obtain Mr. Gupta's cellphones and the passcodes thereto, Mr. Gupta's statements to the Czech officers providing his phone passcodes must be suppressed.

[2] If the Court is inclined to find on the current record that no joint venture existed, we respectfully request that the Court refrain from ruling on this issue until it has first addressed the defense's request for discovery from CA Brannon and SA Catalano, as outlined in the defense's letters dated August 12 and August 22, 2025. Dkt. 96, 100. If the Court grants that request, the record may be supplemented with additional evidence relevant to this question.

## II. THE GOVERNMENT FAILED TO REBUT MR. GUPTA'S CLAIM THAT HIS STATEMENTS DURING THE CZECH INTERROGATION WERE INVOLUNTARY

The government has the burden to establish that Mr. Gupta voluntarily provided statements to Czech officers. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). But the government did not call a single percipient witness with evidence bearing on this issue. Instead, the government presented a 20-second video clip and vague hearsay statements, neither of which establish that Mr. Gupta voluntarily provided his passcodes. Tr. at 39:12-41:22.

The video shows Mr. Gupta surrounded by at least three Czech law enforcement officers within inches of him. *See* GX 112. The officers direct Mr. Gupta to provide his phone passcodes. Both Mr. Gupta and the Czech officers are heard speaking in heavily accented English and Mr. Gupta appears to misunderstand the officer's instructions, as the officer repeatedly tells him to "go to the options" on his other phone. *Id.* Notably absent from this video is any indication of what occurred before this interaction, including whether Mr. Gupta was read his rights, strip-searched, or informed of why he was being detained. Tr. at 101:2-23.

The government could have called a Czech law enforcement officer to support its claim that he provided his passcodes voluntarily, but strategically chose not to do so. TFO Sandobal admitted that he had no independent basis to know whether Mr. Gupta voluntarily provided statements to Czech law enforcement. Tr. at 136:20-22. TFO Sandobal did not know whether Czech officers brought Mr. Gupta into a private room, strip-searched him, advised him of his rights, or forced him to unlock his phones. Tr. at 101:2-23. His summary hearsay account regarding Mr. Gupta's alleged voluntary provision of his passcodes to the Czech authorities (Tr. at 10:17-11:10; 74:3-10) is not sufficient to counter Mr. Gupta's detailed sworn account of the actual event. TFO Sandobal thus did not provide any helpful testimony on whether the Czech officers compelled Mr. Gupta to provide his passcodes or whether he had any meaningful choice

of whether to do so.

Mr. Gupta submitted a sworn declaration stating that Czech officers questioned him in a windowless room, surrounded by six or seven Czech officers after a strip search, and ordered him to unlock his phones. He explained that he didn't feel like he "had any choice" but to comply and "was not given the option to speak with an attorney or to refuse the request." Dkt. No. 67, Gupta Decl. at ¶¶ 4-10. Given the absence of any reliable evidence to the contrary, the Court should give greater weight to Mr. Gupta's sworn declaration. *See United States v. Muhammad*, No. 12 CR 337, 2012 WL 6021458, at *5 (E.D.N.Y. Nov. 19, 2012), *report and recommendation adopted*, 2012 WL 6043589 (E.D.N.Y. Dec. 5, 2012) ("the weight to be accorded to the defendant's affidavit is well within the discretion of the finder of fact."); *see also United States v. Miller*, 382 F. Supp. 2d 350, 362-63 (N.D.N.Y. 2005).

Because the passwords to Mr. Gupta's phones were obtained after an unconstitutional interrogation conducted at the behest of U.S. law enforcement in violation of Mr. Gupta's Fifth Amendment rights, any statements Mr. Gupta made to the Czech police and any information obtained from the use of those passwords must be suppressed. *See, e.g., United States v. Brown*, 125 F.4th 1186, 1204 (D.C. Cir. 2025) ("Because the compelled opening of the cellphone was testimonial, both the message communicated by that action and any evidence obtained from that communication must be suppressed.").

## III. THE DEA FAILED TO PROPERLY ADVISE MR. GUPTA OF HIS RIGHTS

Mr. Gupta's statements to the DEA agents, made in the van after the Czech authorities obtained the passcodes to his cellphones must also be suppressed. The government failed to prove by a preponderance of the evidence at the hearing that he was properly advised of his rights or that he knowingly waived them. *See United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014).

TFO Sandobal's memories of Mr. Gupta's interrogation were inconsistent and contradicted

by objective evidence. Critically, TFO Sandobal testified that SA Franks read the Advice of Rights form aloud to Mr. Gupta in the van. Tr. at 54:9-14. But on cross-examination, TFO Sandobal had no explanation for the fact that the lighting conditions in the van were extremely poor and would not have allowed SA Franks to read aloud from any document. Tr. at 114:11-20. Government Exhibit 105, a photo of Mr. Gupta's phone taken from inside the van, makes clear that the van was nearly pitch-black inside. So dark that one of the agents had to use his phone flashlight to take a picture of the screen of Mr. Gupta's phone. Tr. at 113:8-10. TFO Sandobal offered no explanation on how there could have been "[p]lenty of light" in the van when the photo of Mr. Gupta's phone showed the lighting was extremely poor. Tr. at 123:16-18. In the face of the *objective evidence* in GX 105 of the very dark conditions in the van, it is simply not credible to believe that SA Franks would have been able to read the Advice of Rights form aloud to Mr. Gupta. TFO Sandobal's testimony on this point thus must be disregarded. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (holding that a court need not credit testimony when "objective evidence contradict[s] the witness' story").

TFO Sandobal's recollections of the van interview were contradictory and inconsistent in other respects as well. He initially testified that SA Franks read the Advice of Rights form "straight through," but then changed his account and testified that instead, SA Franks paused after each statement to confirm Mr. Gupta's understanding. Tr. at 115:6-116:22. This shifting account should not be credited.

When questioned about his inconsistent memories of whether SA Franks introduced himself and showed his credentials, TFO Sandobal implausibly testified that his memory improved as the hearing approached. Tr. at 110:10-12 (Q. "So your testimony is your memory has gotten better as we've gotten closer to your testimony today?" A. "Yes."). It is far more likely that

instead, TFO Sandobal's initial vague memories of the interrogation were accurate, since they were closer in time to the event. His more specific recent memories cannot be relied upon, calling into question his entire account of the interrogation.

Instead, the Court should credit Mr. Gupta's detailed sworn declaration, which stated that the DEA agents never advised him of his rights, including the right to remain silent or to counsel, before DEA agents questioned him. Gupta Decl. at ¶ 21. Mr. Gupta explained in his declaration that the DEA agents gave him no meaningful time to read the form, told him falsely that it only stated he did not need a lawyer for questioning, and directed him to print his name without understanding the document. *Id.* at ¶¶ 24-25. Although Mr. Gupta printed his name, his refusal to give consent to be questioned without a lawyer is clearly evidenced by the fact that he declined to sign the form once he became concerned about its contents.

The government has failed to show by a preponderance of the evidence that the DEA properly administered *Miranda* warnings before interrogating Mr. Gupta. Even if the Court were to find that *Miranda* warnings were given, the government has not shown that Mr. Gupta knowingly and intelligently waived his rights. Mr. Gupta's statements to SA Franks and TFO Sandobal must therefore be suppressed.

## IV. MR. GUPTA DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS RIGHTS

Even if Mr. Gupta received proper *Miranda* warnings (he did not), his statements to the DEA agents must be suppressed because he did not knowingly, intelligently, or voluntarily waive his rights. To prove a valid *Miranda* waiver, the government must show by a preponderance of the evidence that: (i) "the relinquishment of the right was voluntary," and (ii) it was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Medunjanin*, 752 F.3d at 586 (internal quotation marks omitted).

Mr. Gupta is a foreign national whose first language is not English. *See* Gupta Decl. at ¶ 24. He has no familiarity with the legal rules relevant to an interrogation by U.S. law enforcement. He was placed in a nearly pitch-black van and given no meaningful opportunity to read or understand the Advice of Rights form. *See id.* at ¶¶ 24-25; Tr. at 114:11-15. When asked to sign the form *after* he was interrogated, Mr. Gupta refused, negating any claim that he ever sought to waive his rights. *See* Gupta Decl. at ¶¶ 21, 24. Under these circumstances, Mr. Gupta cannot have understood the rights he was purportedly waiving. Because the government has failed to establish that Mr. Gupta had a full awareness of the rights he allegedly abandoned or the consequences of abandoning them, Mr. Gupta's statements to the DEA agents must be suppressed. *See United States v. Sultanov*, 742 F. Supp. 3d 258, 306 (E.D.N.Y. 2024) (defendant did not waive his *Miranda* rights where he refused to sign the written waiver form and showed confusion about the warnings).

**CONCLUSION**

For the foregoing reasons, the contents of Mr. Gupta's cellphones and his statements to Czech and U.S. law enforcement personnel must be suppressed.

Dated: August 26, 2025

Respectfully submitted,

Nola B. Heller
Matthew Laroche
Peter Farag
Isabel C. Pitaro
Elyse J. Hain
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5108

*Counsel for Defendant Nikhil Gupta*